MEKA MOORE (SBN 180017)
mmoore@selmanlaw.com
TIMOTHY J. MCFEELY (SBN 293864)
tmcfeely@selmanlaw.com
SELMAN BREITMAN LLP
11766 Wilshire Blvd., Sixth Floor
Los Angeles, CA 90025-6538
Telephone: 310.445.0800
Facsimile: 310.473.2525

Attorneys for Plaintiff Nautilus Insurance Company

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAUTILUS INSURANCE COMPANY, an Arizona corporation, | Case No: 2:17-cv-01649 |
| Plaintiff, | |
| v. | NAUTILUS INSURANCE COMPANY'S COMPLAINT FOR DECLARATORY RELIEF |
| DAY TO DAY FASHION, INC., a California corporation; and DOES 1 through 20, inclusive, | |
| Defendants. | |

Plaintiff, NAUTILUS INSURANCE COMPANY ("Nautilus"), by and through its attorneys of record, alleges as follows:

## **JURISDICTION AND VENUE**

1.      This is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interest.  This court has diversity jurisdiction under 28 U.S.C. § 1332.  Additionally, this court has jurisdiction to provide declaratory relief pursuant to 28 U.S.C. § 2201.

2.      Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391 because defendant resides in this district, defendant is subject to personal jurisdiction in this district, and a substantial

1

735655.1 3891.39693

1    portion of the events giving rise to this complaint occurred in this district.

2    **THE PARTIES**

3         3.    Plaintiff Nautilus Insurance Company ("Nautilus") is a corporation

4    organized and existing under the laws of the State of Arizona with its principal place

5    of business in Scottsdale, Arizona.

6         4.    Plaintiff is informed and believes, and thereon alleges, that Defendant

7    Day To Day Fashion, Inc. ("Day To Day") is a corporation organized and existing

8    under the laws of the State of California with its principal place of business located at

9    1130 S. Los Angeles Street, Los Angeles, California 90015.

10        5.    The true names or capacities, whether individual, governmental,

11   corporate or otherwise, of Does 1 through 20, inclusive, are presently unknown to

12   Nautilus, who therefore sues such defendants by fictitious names.  Nautilus is

13   informed and believes, and thereon alleges, that each of the defendants designated

14   herein as a Doe has some connection with the activities complained of herein, and are

15   responsible in some way for the wrongful conduct herein alleged.  Nautilus will

16   amend this complaint to set forth the true names and capacities of the defendants

17   designated as Does 1 through 20, inclusive, when the same have been ascertained.

18        6.    Nautilus is informed and believes, and thereon alleges, that at all times

19   mentioned herein, each of the defendants, both named and fictitiously designated,

20   were the agents, servants, employees, alter egos and/or joint ventures of the other

21   defendants, and each of them, and were at all times acting within the course and scope

22   of such agency, employment and/or joint venture relationship, and within the

23   permission and consent of the remaining defendants.

24   **GENERAL ALLEGATIONS**

25        7.    On or about March 19, 2015, Day To Day signed and submitted a

26   Commercial Insurance Application to Nautilus through its insurance broker PARS

27   American Insurance Agency.  Defendant stated in the application, among other things,

28

Nautilus Insurance Company's Complaint For Declaratory Relief

735655.1 3891.39693

1   that:  (1) there were no bankruptcies in the five year period prior to submitting the

2   application; (2) that there were no insurance claims or losses within the five year

3   period prior to submitting the application; and (3) that no policies or coverage were

4   declined, canceled or nonrenewed within the three year period prior to submitting the

5   application.

6       8.    Based on the representations in the insurance application, Nautilus

7   issued Commercial Lines Policy No. NN496718 (the "Nautilus Policy" or "Policy No.

8   NN496718") to Day To Day for the policy period March 22, 2015 to March 22, 2016.

9   The Nautilus Policy insured the premises located at 1130 S. Los Angeles Street, Los

10   Angeles, California 90015 ("1130 S. Los Angeles Street") and provided Business

11   Personal Property limits of $2.3 million, Business Income (And Extra Expense) limits

12   of $300,000, and Commercial General Liability limits of $1 million per occurrence.  A

13   true and correct copy of Nautilus Policy No. NN496718 is attached hereto as <u>Exhibit</u>

14   <u>A</u> and is incorporated herein by reference.

15       9.    On or about February 6, 2016, a fire occurred at 1130 S. Los Angeles

16   Street which allegedly damaged Day To Day's property, including business inventory.

17       10.    Day To Day submitted an insurance claim to Nautilus on or about

18   February 6, 2016, seeking to recover the full $2.3 million Business Personal Property

19   coverage limit and the $300,000 Business Income (And Extra Expense) coverage limit

20   due to the alleged damage caused by the fire.

21       11.    Day To Day retained Dietz International as its public insurance adjuster

22   to assist in presenting the claim to Nautilus.

23       12.    After receiving notice of the claim, Nautilus began investigating the

24   facts of loss and extent of claimed damages as authorized by the Nautilus Policy.  In

25   furtherance of that investigation, Day To Day's President Bahram Navabian appeared

26   for an examination under oath in connection with the insurance claim on July 14, 2016

27   and again on November 11, 2016.

28

Nautilus Insurance Company's Complaint For Declaratory Relief

735655.1 3891.39693

1       13.    Bahram Navabian testified that he was the principal of Day To Day and

2   the sole owner, officer and director.

3       14.    Nautilus' investigation revealed that Day To Day misrepresented that:

4   (1) there were no bankruptcies in the five year period prior to the application; and (2)

5   there were no insurance claims or losses in the five year period prior to the

6   application.

7       15.    On March 1, 2017, Nautilus rescinded Policy No. NN496718 based on

8   the material misrepresentations in Day To Day's insurance application.  Nautilus

9   refunded Day To Day's premium in the amount of $10,977.74.  A true and correct

10  copy of Nautilus' March 1, 2017 correspondence rescinding Policy No. NN496718 is

11  attached hereto as Exhibit B and is incorporated herein by reference.

12      16.    Nautilus' March 1, 2017 correspondence to Day To Day also expressly

13  reserved the right to deny coverage based upon fraud, intentional misrepresentation

14  and/or intentional concealment committed by Day To Day in presenting the insurance

15  claim to Nautilus.  Nautilus is informed and believes, and thereon alleges, that the

16  intentional misrepresentations and/or concealments in presenting the claim include,

17  but are not limited to, the following:

18      a.  Day To Day President Bahram Navabian's testimony regarding his

19  business relationship and/or role at the businesses B&B Design Collection, Inc.

20  ("B&B Design") and/or American Fashion, Inc. ("American Fashion");

21      b.  Bahram Navabian testified that his role at B&B Design ended when he

22  opened Day To Day in 2012, however B&B Design's corporate records indicate that

23  he remained a corporate officer until 2015;

24      c.  Mr. Navabian claims that the first time he visited the loss location at

25  1130 S. Los Angeles Street was when he became a tenant as part of B&B Design

26  sometime in 2010.  He later testified that he was aware that Best Design did business

27  from that location prior to 2010 and that he knew the owner Fariborz Mosazadeh for

28

735655.1 3891.39693

1    over twenty years;

2         d.  On or about June 3, 2013, Bahram Navabian filed a Chapter 7

3    bankruptcy petition in the United States Bankruptcy Court for the Central District of

4    California under Case No. 2:13-bk-24630-TD.  Bahram Navabian did not initially

5    disclose that he filed for bankruptcy at his examination under oath.  Mr. Navabian

6    testified that he was doing well financially in business and personally;

7         e.  Bahram Navabian failed to disclose Fariborz Mosazadeh's role in Day

8    To Day.  Following the fire, Fariborz Mosazadeh advised that he was a "silent"

9    partner in Day To Day, however Mr. Navabian denied this at his examination under

10   oath, claiming that Mr. Mosazadeh had no role whatsoever at Day To Day.  Navabian

11   later stated that Mr. Mosazadeh worked at Day To Day 3-4 days per week, including

12   supervision of cut orders and communication with clients;

13        f.  At the examination under oath, Mr. Navabian testified that he did not

14   recall the name of the business owner for Amir Fusing, Inc. ("Amir Fusing"), however

15   he later admitted to knowing the owner, Amir Mosazadeh for over ten years;

16        g.  At the examination under oath, Mr. Navabian testified that Day To

17   Day's business transactions with Amir Fusing were limited to a single transaction

18   involving an order that formed part of Day To Day's insurance claim with Nautilus.

19   Nautilus' investigation revealed, however, that Day To Day had other transactions

20   with Amir Fusing that were not disclosed;

21        h.  Mr. Navabian testified that he had no role at the business Amir Fusing

22   and that no one else had authority to access Day To Day's bank account, however

23   Nautilus' investigation revealed that Amir Fusing made wire transfers of money from

24   Day To Day's Hanmi Bank account in connection with Amir Fusing's business

25   activities;

26        i.  Mr. Navabian's testimony regarding the documentation to support the

27   claimed loss has been inconsistent throughout the claim;

28

Nautilus Insurance Company's Complaint For Declaratory Relief

735655.1 3891.39693

1        j.  Mr. Navabian testified at the examination under oath that Day To Day

2  only maintains one bank account at Hanmi Bank.  The documents filed in the Chapter

3  7 Bankruptcy proceeding reflect that he had multiple accounts at Hanmi Bank;

4        k.  Day To Day's piecemeal production of requested documents has been

5  inconsistent and contradictory with regard to the existence of responsive documents.

6  Day To Day repeatedly advised that no supporting documents existed for a specific

7  document request only to later produce documents months later.  For example, on

8  February 1, 2017, Day To Day produced multiple order forms, purportedly reflecting

9  sales to customers.  These invoices were dated in 2014 and 2015, yet Day To Day

10  offered no explanation regarding why these documents were not previously produced;

11        l.  At the examination under oath, Bahram Navabian testified that Day To

12  Day provided only bank account records to its accountant for the purpose of preparing

13  Day To Day's profit and loss statements.  The bank records do not support that Day

14  To Day ever had the funds and/or cash flow to support the purchases reflected in the

15  profit and loss statements, including $3,717,263.04 in alleged purchases in 2015.  The

16  Chapter 7 Bankruptcy records also do not reflect that Mr. Navabian possessed

17  $3,717,263.04 in inventory assets and/or the money to purchase such assets;

18        m. Day To Day produced documents to support the value of the claimed

19  lost inventory, including invoices from Best Design Collection, Inc. ("Best Design")

20  dated in the year 2015.  Nautilus' investigation revealed that Best Design ceased doing

21  business in 2013;

22        n.  At the examination under oath, Mr. Navabian repeatedly stated that the

23  damaged inventory was not purchased by Day To Day but was obtained on

24  consignment.  He later disclosed approximately seventy-five receipts to support

25  purchase of the damaged inventory.  The receipts were all handwritten by Mr.

26  Navabian and none match to any particular invoice produced by Day To Day;

27        o.  Bahram Navabian testified that he wrote all invoices/receipts by hand

28

Nautilus Insurance Company's Complaint For Declaratory Relief

1    and that Day To Day did not use any computer-generated invoices or receipts.

2    Nautilus' investigation revealed that Day To Day did issue computer-generated

3    records and that such invoices were presented to another insurer in connection with an

4    unrelated insurance claim;

5            p.  Mr. Navabian testified that there were four computers on the Day To

6    Day business premises at 1130 S. Los Angeles Street, but that none were used for

7    business reasons other than for printing packing labels;

8            q.  Mr. Navabian testified that he did not use the Day To Day cash register

9    to generate receipts, however receipt rolls are noticeably present in the post-loss

10   photos of the cash register;

11           r.  A candle was discovered on the premises following the fire.  Mr.

12   Navabian stated that there was no business reason for a candle to be amongst the

13   inventory, while also admitting there was no evidence of forced entry.

14   **FIRST CAUSE OF ACTION**

15   **DECLARATORY RELIEF – RESCISSION**

16   (Against All Defendants)

17       17.    Nautilus re-alleges and incorporates by this reference all preceding

18   paragraphs above, in their entirety, as though fully set forth herein.

19       18.    At the time Day to Day submitted its insurance application to Nautilus

20   for Policy No. NN496718, Day To Day misrepresented that:  (1) there were no

21   bankruptcies in the five year period prior to the application; and (2) there were no

22   insurance claims or losses in the five year period prior to the application.

23       19.    On or about June 3, 2013, Day To Day's President Bahram Navabian

24   filed a Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the

25   Central District of California under Case No. 2:13-bk-24630-TD (the "Bankruptcy

26   Proceeding").  Mr. Navabian sought to discharge millions of dollars in debt in the

27   Bankruptcy Proceeding, including business debt.

28

735655.1 3891.39693

20. Bahram Navabian admitted under oath that there was a pending bankruptcy as of the time that Day To Day submitted the insurance application to Nautilus. In that regard, Mr. Navabian testified during his July 14, 2016 examination under oath:

> Q: Have you or Day To Day had any bankruptcies in the last five years – well, in the five-year period prior to 3-14 to 2-15?
>
> A: No.
>
> ...
>
> Q: Okay. And you have not had any personal bankruptcies?
>
> A: Yes, I had.
>
> Q: You did?
>
> A: Yes.
>
> Q: When was that?
>
> A: 2013.
>
> ...
>
> Q: So as of the time this application was signed, did you have a bankruptcy that was pending?
>
> A: Yes.

21. Mr. Navabian further testified at the examination under oath that he did not disclose his pending $2.6 million insurance claim with Nautilus during the Bankruptcy Proceeding:

> Q: Do you remember whether you disclosed that you had an insurance claim pending with Nautilus Insurance Company to the bankruptcy court?
>
> A: I didn't say.
>
> Q: You did not?
>
> A: I didn't disclose. As far as I know, I didn't tell anybody. Nobody

Nautilus Insurance Company's Complaint For Declaratory Relief

735655.1 3891.39693

1    asked.

2       22.    Bahram Navabian testified that he was a "silent partner" that shared in

3    the profits of the business B&B Design.  Mr. Navabian testified that he worked for

4    B&B Design for three or four years, ending in 2012 and that he received

5    approximately $350,000 in insurance proceeds following B&B Design's 2011

6    insurance claim.  In that regard, Mr. Navabian testified under oath as follows:

7        **Q:**    And before Day To Day Fashion, what did you do?

8        **A:**    B&B Design.

9        **Q:**    B&B.

10       …

11       **Q:**    And how long were you there?

12       **A:**    Three or four years.

13       …

14       **Q:**    …When you were at B&B, were you a silent partner at B&B?

15       **A:**    No.  When I was there, I was a silent partner, but when I started

16           my own business, I was not a silent partner anymore.

17       **Q:**    Okay.  So what I'm trying to find out is what businesses were

18           you a silent partner with.

19       **A:**    Only B&B.

20       **Q:**    Okay.  So by being a silent partner, you shared in the profits?

21       **A:**    Yes.

22       …

23       **Q:**    What type of insurance claims did B&B have?

24       **A:**    It was my brother's.  I think – do you want to see what

25           happened?

26       **Q:**    I just want to know – yea, I asked what kind of insurance

27           claims B&B had.

28

Nautilus Insurance Company's Complaint For Declaratory Relief

|   |   |   |
|---|---|---|
| 1 | A: | Smoke. |
| 2 | Q: | B&B had a smoke claim? |
| 3 | A: | Yes. |
| 4 | Q: | When was that? |
| 5 | A: | I believe in 2011. |
| 6 | | ... |
| 7 | Q: | Okay.  Do you know who the insurance company was for |
| 8 | | B&B? |
| 9 | A: | I don't recall. |
| 10 | Q: | Okay.  Do you know if that insurance claim was paid? |
| 11 | A: | As far as I know, yes. |
| 12 | Q: | Okay.  And did you receive any of the proceeds from the |
| 13 | | insurance claim? |
| 14 | A: | Some amount.  I don't recall the exact amount.  If you want, I |
| 15 | | can give you an estimate. |
| 16 | Q: | Sure. |
| 17 | A: | Out $350,000.  300- to $350,000. |

18    23.    Nautilus is informed and believes, and thereon alleges, that Day To Day

19 failed to disclose Fariborz Mosazadeh's role in Day To Day.  Bahram Navabian

20 denied that Fariborz Mosazadeh had any role at Day To Day during the examination

21 under oath.  He later testified that Mr. Mosazadeh did have a role in Day To Day's

22 business and worked at the Day To Day premises 3-4 times per week, performing

23 duties including managing production, supervising cut orders and communicating

24 with clients.  Day To Day failed to disclose Fariborz Mosazadeh's role as a business

25 partner in Day To Day's operations in the insurance application and likewise failed to

26 disclose Fariborz Mosazadeh's insurance claims history in the application.  Nautilus'

27 investigation revealed that Fariborz Mosazadeh has been involved in multiple

28

insurance claims including, but not limited to:

    a.  A 2010 fire loss at 1130 S. Los Angeles Street;

    b.  A 2013 fire loss at 1250 S. Los Angeles Street;

    c.  A June 2015 water loss;

    d.  A 2012 water loss;

    e.  A November 2012 water loss; and

    f.  A 2008 fire loss at 224 E. 11th Street.

24.    Day To Day warranted that the information provided in the application was correct and complete, when in fact those representations and information were and are materially false.

25.    Day To Day's representations in the application regarding prior bankruptcies and/or prior losses and claims, as detailed above, constitute material misrepresentations concerning the risk of loss and exposure for which coverage was sought under the Nautilus Policy.

26.    Nautilus reasonably relied upon Day To Day's representations in the insurance application, and Nautilus did not know that Day To Day's representations were false.

27.    The information that Day To Day provided in connection with its efforts to obtain insurance coverage under Policy No. NN496718 misrepresented, concealed and/or failed to disclose the true risk of exposure that Nautilus faced in connection with the insurance coverage it provided under the Nautilus Policy.

28.    Nautilus issued Policy No. NN496718 and accepted the insurance risks under that policy based upon Day To Day's representations in the insurance application.

29.    If Day To Day truthfully disclosed the Bankruptcy Proceeding, then Nautilus would not have issued Policy No. NN496718 or Nautilus would have charged a higher premium commensurate with the greater risk and exposure.

Nautilus Insurance Company's Complaint For Declaratory Relief

735655.1 3891.39693

30.     If Day To Day truthfully disclosed B&B Design's prior claims and/or loss history, then Nautilus would not have issued Policy No. NN496718 or Nautilus would have charged a higher premium commensurate with the greater risk and exposure.

31.     If Day To Day truthfully disclosed Fariborz Mosazadeh's role at Day To Day and his prior claims and/or loss history, then Nautilus would not have issued Policy No. NN496718 or Nautilus would have charged a higher premium commensurate with the greater risk and exposure.

32.     Material misrepresentations and/or concealment in an insurance application, whether made intentionally or unintentionally, are grounds for policy rescission pursuant to California statutory law including, but not limited to, Insurance Code sections 331, 338 and 359, and Civil Code section 1689.

33.     As a result of Day To Day's misrepresentations, concealment and/or failure to truthfully disclose material facts and information during the insurance application process, Nautilus was entitled to rescind, and therefore did rescind Policy No. NN496718 in its entirety.

34.     Nautilus is informed and believes, and thereon alleges, that the defendants, and each of them, dispute Nautilus' right to rescind Policy No. NN496718.

35.     Nautilus is informed and believes, and thereon alleges, that the defendants, and each of them, claim that Policy No. NN496718 remains in full force and effect.

36.     Nautilus is informed and believes, and thereon alleges, that the defendants, and each of them, claim that they are entitled to the payment of policy benefits from Nautilus under Policy No. NN496718.

37.     Nautilus is informed and believes, and thereon alleges, that Day To Day continues to contend that it is entitled to policy benefits and/or that Nautilus may have

an obligation to Day To Day pursuant to the Nautilus Policy.  Nautilus contends that it has no obligation under any of the Nautilus Policy coverage parts as Nautilus properly rescinded Policy No. NN496718, such that the Nautilus Policy is extinguished *ab initio* and is totally void and unenforceable from the outset.

38.     An actual controversy therefore exists between the parties that now requires a judicial declaration to determine the parties' respective rights and obligations with respect to Policy No. NN496718.

39.     Nautilus seeks a declaration that it properly rescinded Policy No. NN496718, such that the policy is totally void and unenforceable from the outset, due to Day To Day's misrepresentation, concealment and/or failure to disclose material facts and information regarding its prior bankruptcy history in the insurance application.

40.     Nautilus seeks a declaration that it properly rescinded Policy No. NN496718, such that the policy is totally void and unenforceable from the outset, due to Day To Day's misrepresentation, concealment and/or failure to disclose material facts and information regarding its prior insurance claims and loss history in the insurance application.

41.     Accordingly, Nautilus hereby requests that this Court adjudge, declare and decree that Policy No. NN496718 is rescinded based on Day To Day's misrepresentation, concealment and/or failure to disclose material facts, such that Nautilus does not owe any policy benefits in connection with Day To Day's insurance claim.

## SECOND CAUSE OF ACTION
## DECLARATORY RELIEF – INTENTIONAL MISREPRESENTATION
(Against All Defendants)

42.     Nautilus re-alleges and incorporates by this reference all preceding paragraphs above, in their entirety, as though fully set forth herein.

735655.1 3891.39693

43. At the time Day to Day submitted its insurance application to Nautilus for Policy No. NN496718, Day To Day intentionally misrepresented that: (1) there were no bankruptcies in the five year period prior to the application; and (2) there were no insurance claims or losses in the five year period prior to the application.

44. On or about June 3, 2013, Day To Day's President Bahram Navabian filed the Bankruptcy Proceeding in the United States Bankruptcy Court for the Central District of California. Mr. Navabian intentionally concealed this prior bankruptcy in the insurance application.

45. Bahram Navabian testified that he was a "silent partner" that shared in the profits of the business B&B Design. Mr. Navabian testified that he worked for B&B Design for three or four years, ending in 2012 and that he received approximately $350,000 in insurance proceeds following B&B Design's 2011 insurance claim for smoke damage. Mr. Navabian intentionally concealed this prior insurance claim in the insurance application.

46. Nautilus is informed and believes, and thereon alleges, that Day To Day intentionally failed to disclose Fariborz Mosazadeh's role in Day To Day. Bahram Navabian denied that Fariborz Mosazadeh had any role at Day To Day during the examination under oath. He later testified that Mr. Mosazadeh did have a role in Day To Day's business and worked at the Day To Day premises 3-4 times per week, performing duties including managing production, supervising cut orders and communicating with clients. Day To Day failed to disclose Fariborz Mosazadeh's role in Day To Day's operations as a business partner in the insurance application and likewise failed to disclose Fariborz Mosazadeh's insurance claims history in the application. Nautilus' investigation revealed that Fariborz Mosazadeh has been involved in multiple insurance claims, including at least five insurance claims in the five year period prior to Day To Day's submission of the insurance application to Nautilus. Mr. Navabian intentionally concealed these prior insurance claims in the

Nautilus Insurance Company's Complaint For Declaratory Relief

insurance application.

47.     Day To Day intentionally warranted that the information provided in the application was correct and complete, when in fact those representations and information were and are materially false.

48.     Day To Day's representations in the application regarding prior bankruptcies and/or prior losses and claims, as detailed above, constitute material intentional misrepresentations concerning the risk of loss and exposure for which coverage was sought under the Nautilus Policy.

49.     Nautilus reasonably relied upon Day To Day's representations in the insurance application, and Nautilus did not know that Day To Day's representations were false.

50.     The information that Day To Day provided in connection with its efforts to obtain insurance coverage under Policy No. NN496718 intentionally misrepresented, concealed and/or failed to disclose the true risk of exposure that Nautilus faced in connection with the insurance coverage it provided under the Nautilus Policy.

51.     Nautilus is informed and believes, and thereon alleges, that defendant also intentionally misrepresented material facts and/or intentionally concealed material facts during the claim, which include but are not limited to the following:

a.  Defendant misrepresented Fariborz Mosazadeh's role in Day To Day. Mr. Mosazadeh advised the independent adjuster that he was a "silent partner" in Day To Day, however Bahram Navabian denied this and claimed that Mr. Mosazadeh had no role whatsoever at Day To Day.  In that regard, Mr. Navabian testified as follows under oath at his July 14, 2016 examination under oath:

> **Q:**     Does Fariborz Mosazadeh have any role in Day To Day?
>
> **A:**     No.
>
> **...**

735655.1 3891.39693

| | | |
|---|---|---|
| 1 | **Q:** | Okay.  What about Mr. Mosazadeh?  Does he have any |
| 2 | | role in Day To Day? |
| 3 | **A:** | No. |
| 4 | **...** | |
| 5 | **Q:** | Okay.  Have you ever told anyone from Nautilus that Mr. |
| 6 | | Mosazadeh was an owner or a silent partner in Day To |
| 7 | | Day? |
| 8 | **A:** | As far as I know, the answer is no. |
| 9 | **Q:** | Okay.  And your testimony today is that he is not an |
| 10 | | owner – correct? – with Day To Day? |
| 11 | **A:** | He doesn't have any share or any part in it.  Nothing. |
| 12 | **Q:** | Okay.  So he's not an owner.  He has no role |
| 13 | | whatsoever? |
| 14 | **A:** | That's correct. |

15 Mr. Navabian later contradicted the above testimony, stating that Mosazadeh worked

16 at Day To Day up to four days per week supervising cut orders and communicating

17 with clients.  He testified under oath as follows at his November 11, 2016 examination

18 under oath:

| | | |
|---|---|---|
| 19 | **Q:** | Okay.  How often was Mr. Mosazadeh on site at your |
| 20 | | premises? |
| 21 | **A:** | Two to four times a week when he wanted to help me. |
| 22 | **Q:** | Two to four times a week he was there? |
| 23 | **A:** | Two or three or four times. |
| 24 | **...** | |
| 25 | **Q:** | So he would supervise the product? |
| 26 | **A:** | Kind of, yes.  And if it was okay he would leave. |
| 27 | **...** | |
| 28 | | |

Nautilus Insurance Company's Complaint For Declaratory Relief

735655.1 3891.39693

1         **Q:**    Did Los Angelos communicate with him at all with

2                 respect to their orders?

3         **A:**    Yes.  Because he has to say the cost to provide the cost

4                 and information;

5        b. Bahram Navabian misrepresented his ongoing role with B&B Design,

6 testifying under oath on November 11, 2016 that he did not maintain a role at B&B

7 Design after opening Day To Day in 2012:

8         **Q:**    Okay.  And when did you stop being an officer of B&B?

9         **A:**    When I opened Day To Day.

10        **Q:**    Which was in 2012?

11        **A:**    Correct.

12        **Q:**    And after you opened Day To Day in 2012 you did not

13               continue to have any role at B&B?

14        **A:**    No.

15 Nautilus' investigation revealed, however, that Bahram Navabian was B&B Design's

16 Chief Financial Officer as of B&B Design's June 29, 2015 corporate filings with the

17 California Secretary of State;

18        c. Bahram Navabian misrepresented his use of an email address tied to his

19 brother's business.  Mr. Navabian testified under oath that he had not used the email

20 address for at least five years:

21        **Q:**    Do you only use one email address or do you have more

22              than one?

23        **A:**    Just one.

24        **Q:**    And how long have you used this email address?

25        **A:**    Five to six years.

26        **Q:**    Did you have an email address before that?

27        **A:**    Yes.  Bob@amandafashiondiscount

28

Nautilus Insurance Company's Complaint For Declaratory Relief

735655.1 3891.39693

| | |
|---|---|
| 1 | **Q:** When did you use that email address? |
| 2 | **A:** More than five years ago. |
| 3 | **Q:** You haven't used it since then? |
| 4 | **A:** No. |

5 However, his insurance broker PARS American Insurance Agency sent several emails

6 to that address, including an email as recent as February 27, 2015 to send Mr.

7 Navabian an insurance quote;

8      d. Bahram Navabian did not initially disclose the pending Bankruptcy

9 Proceeding at his July 14, 2016 examination under oath, testifying that he was doing

10 well financially in business and personally:

| | |
|---|---|
| 11 | **Q:** At the time – let's go back a little bit to the time period |
| 12 | right before the fire.  What was the financial condition of |
| 13 | Day To Day?  How was the financial condition? |
| 14 | **A:** Good. |
| 15 | **...** |
| 16 | **Q:** What about you personally?  Everything going well |
| 17 | financially? |
| 18 | **A:** Yes. |

19 As set forth above, Mr. Navabian later admitted to filing Chapter 7 bankruptcy in

20 2013;

21      e. At the examination under oath, Bahram Navabian testified that Day To

22 Day's business transactions with Amir Fusing were limited to a single transaction

23 involving an order that formed part of Day To Day's insurance claim with Nautilus.

24 Nautilus' investigation revealed, however, that Day To Day had other transactions

25 with Amir Fusing that were not disclosed;

26      f. Mr. Navabian misrepresented his relationship with Amir Fusing.  He

27 initially could not recall the name of the Amir Fusing owner, yet later admitted to

28

Nautilus Insurance Company's Complaint For Declaratory Relief

735655.1 3891.39693

1   knowing him for more than ten years:

2   **Q:**   You actually do the fusing there on site at Day To Day?

3   **A:**   No.  We would send out to fuse.

4   **Q:**   And who does that?

5   **A:**   I don't have it.  I show you.  I don't know the name of

6          you.  I provide you.

7   ...

8   **Q:**   Okay.  What is that?  Just for the record, it says "Amir

9          Fusing."

10  **A:**   This is the fusing.  You asked for its name.

11  **Q:**   This is the name that you had forgotten, Amir Fusing?

12  **A:**   Yes.

13  **Q:**   Okay.  And who is your contact at Amir Fusing?

14  **A:**   Amir.

15  **Q:**   Okay.  And does he have a last name?

16  **A:**   Amir Mosazadeh.

17  **Q:**   You forgot Amir Mosazadeh's name when I asked you

18         earlier?

19  **A:**   Amir Mosazadeh.

20  **Q:**   Is he related to Fariborz?

21  **A:**   He is his brother.

22  ...

23  **Q:**   How long have you known Amir Mosazadeh?

24  **A:**   Ten years.  Many years.  Maybe more.

25  **Q:**   So you think maybe you have known him more than ten

26         years?

27  **A:**   More than ten years.  But we had not much business.

28

Nautilus Insurance Company's Complaint For Declaratory Relief

1   Only fusing;

2   g.  Mr. Navabian misrepresented his business contacts with Amir Fusing.

3   He testified that he had no role at Amir Fusing and that no one else had authority to

4   access his bank account, however Nautilus' investigation revealed that Amir Fusing

5   made wire transfers of money from Day To Day's Hanmi Bank account in connection

6   with Amir Fusing's business activities:

7   **Q:**   And you don't have any role at Amir Fusing; correct?

8   **A:**   That's correct;

9   h.  Mr. Navabian's testimony regarding the documentation to support the

10   claimed loss has been inconsistent throughout the claim;

11   i.  Bahram Navabian testified under oath that he maintains only one bank

12   account with Hanmi Bank.  The Bankruptcy Proceeding records, however, reveal that

13   he maintains more than one Hanmi Bank account and these records were not produced

14   as requested by Nautilus;

15   j.  Day To Day's piecemeal production of requested documents has been

16   inconsistent and contradictory with regard to the existence of responsive documents.

17   Day To Day repeatedly advised that no supporting documents existed for a specific

18   document request only to later produce documents months later.  On February 1,

19   2017, Day To Day produced multiple order forms, purportedly reflecting sales to

20   customers.  These invoices were dated 2014 and 2015, yet Day To Day offered no

21   explanation regarding why the documents were not previously produced;

22   k.  Defendant presented over $600,000 in invoices from Best Design that

23   were dated in the year 2015.  Nautilus' investigation revealed that Best Design

24   testified that it ceased doing business in 2013.  Mr. Navabian testified under oath

25   regarding his alleged business relationship with Best Design:

26   **Q:**   All right.  So Mr. Mosazadeh has a business called "Best

27   Design," and you obtain merchandise from him on

28

| | | |
|---|---|---|
| 1 | | consignment; correct? |
| 2 | **A:** | Yes. |
| 3 | ... | |
| 4 | **Q:** | Okay.  Are Best Design and American Fashion your |
| 5 | | biggest sources of merchandise? |
| 6 | **A:** | Yes. |
| 7 | ... | |
| 8 | **Q:** | Okay.  So all of these invoices from American Fashion |
| 9 | | and Best Design are the invoices to show what inventory |
| 10 | | they provided to Day To Day Fashion with; is that right? |
| 11 | **A:** | Yes; |

12      1.   Day To Day misrepresented the facts regarding the business' use of

13   computer-generated invoices and/or receipts.  Mr. Navabian testified during the

14   examination under oath in this regard as follows:

| | | |
|---|---|---|
| 15 | **Q:** | Does Day To Day have any computer-generated invoices |
| 16 | | or receipts? |
| 17 | **A:** | Because I was alone I would write everything by hand |
| 18 | | including the invoices.  I have to forward invoices. |
| 19 | | There were templates or prepared invoices and I use |
| 20 | | them. |
| 21 | **Q:** | Okay.  So you do have computer-generated invoices and |
| 22 | | receipts? |
| 23 | **A:** | No.  When I receive merchandise from my manufacturers |
| 24 | | they give – they provide computer-generated invoices. |
| 25 | **Q:** | Okay.  But what I'm asking and, Jesse, maybe you can |
| 26 | | help me here, all I am trying to find out is does Day To |
| 27 | | Day provide computer-generated invoices or receipts |
| 28 | | |

Nautilus Insurance Company's Complaint For Declaratory Relief

1         ever?

2         **A:**    No.

3  Nautilus' investigation revealed, however, that Day To Day did issue computer-

4  generated invoices, and that such invoices were presented to another insurer in

5  connection with an unrelated insurance claim.  Day To Day misrepresented the facts

6  regarding its business operation and the availability of computer-generated records to

7  support its claimed damages;

8         m. Mr. Navabian testified that there were four computers on the Day To

9  Day business premises at 1130 S. Los Angeles Street, but that none were used for

10  business reasons other than for printing packing labels;

11         n. Mr. Navabian testified that he did not use the Day To Day cash register

12  to generate receipts, however receipt rolls are noticeably present in the post-loss

13  photos of the cash register;

14         o. Mr. Navabian testified at the examination under oath that his accountant

15  generated profit and loss statements based solely on bank records:

16         **Q:**    Okay.  And then what do you provide to your

17                  accountants so that they can do your profit and loss

18                  statements?

19         **A:**    The statements.  I don't report the cash sales.  Sales with

20                  documents. Statements. Statements.

21         **Q:**    Bank statements?

22         **A:**    Bank statements.

23         **Q:**    Okay.  But you don't provide your accountant with the

24                  invoices documenting the sales?

25         **A:**    No.  Only the money are deposited into the account.

26         …

27         **Q:**    So your accountants don't use any type of purchase or

28

Nautilus Insurance Company's Complaint For Declaratory Relief

1                sales invoices or anything like that, they just go by your

2                bank statements?

3      **A:**      Exactly.  Every two or three months I provide the bank

4                statements.  That's it.

5  Nautilus requested the bank records and profit and loss statements as part of its

6  investigation; however the bank records do not support any of the financial figures in

7  the profit and loss statements.  The bank records do not support that Day To Day

8  possessed the required funds to make the purchases reflected in the profit and loss

9  statements, including \$3,717,263.04 in alleged purchases in 2015.  Further, the

10  Bankruptcy Proceeding records do not reflect that Mr. Navabian possessed

11  \$3,717,263.04 in inventory assets and/or the money to purchase such assets;

12        p.  At the examination under oath, Mr. Navabian repeatedly stated that the

13  damaged inventory was not purchased by Day To Day but was obtained on

14  consignment.  He later produced approximately seventy-five receipts to support

15  purchase of the damaged inventory.  The receipts were all handwritten by Mr.

16  Navabian and none match to any particular invoice produced by Day To Day.

17       52.      The Nautilus Policy includes the California Changes Endorsement

18  (Form IL 01 04 02 04) which modifies the Commercial Property Coverage Part and

19  which expressly provides:

20      **B.**     The **Concealment, Misrepresentation Or Fraud** Condition is

21              replaced by the following with respect to loss ("loss") or damage

22              caused by fire:

23              We do not provide coverage to the insured ("insured") who,

24              whether before or after a loss ("loss"), has committed fraud or

25              intentionally concealed or misrepresented any material fact or

26              circumstance concerning:

27              **1.**   This Coverage Part;

28

Nautilus Insurance Company's Complaint For Declaratory Relief

1          **2.** The Covered Property;

2          **3.** That insured's ("insured's") interest in the Covered Property; or

3          **4.** A claim under this Coverage Part or Coverage Form.

4          53.     On March 1, 2017, Nautilus forwarded correspondence to Day To Day

5   explaining the misrepresentations and/or concealments committed by Day To Day in

6   presenting its claim to Nautilus.  The March 1, 2017 correspondence expressly

7   reserved Nautilus' right to deny coverage based upon these intentional

8   misrepresentations and/or concealments.

9          54.     Day To Day committed multiple intentional misrepresentations of

10  material fact and/or intentionally concealed material facts in the insurance application

11  in direct violation of the Nautilus Policy's Concealment, Misrepresentation Or Fraud

12  Condition.  Such misrepresentations and/or concealments entitle Nautilus to deny Day

13  To Day's claim for insurance benefits.

14         55.     Day To Day committed multiple intentional misrepresentations of

15  material fact and/or intentionally concealed material facts in presenting the insurance

16  claim to Nautilus in direct violation of the Nautilus Policy's Concealment,

17  Misrepresentation Or Fraud Condition.  Such misrepresentations and/or concealments

18  entitle Nautilus to deny Day To Day's claim for insurance benefits.

19         56.     Nautilus is informed and believes, and thereon alleges, that defendants,

20  and each of them, dispute Nautilus' contentions herein that Nautilus is entitled to deny

21  coverage due to Day To Day's violation of the Nautilus Policy's Concealment,

22  Misrepresentation Or Fraud Condition.

23         57.     Nautilus is informed and believes, and based thereon alleges, that the

24  defendants, and each of them, continue to claim that they are entitled to the payment

25  of policy benefits from Nautilus under Policy No. NN496718.

26         58.     Nautilus contends that it does not owe any policy benefits because the

27  Nautilus Policy was properly rescinded, such that the Nautilus Policy is void and

28

735655.1 3891.39693

unenforceable from the outset, due to material misrepresentations and/or concealment of material facts in Day to Day's insurance application.  However, even if the Nautilus Policy were in effect, then Nautilus contends that it has no obligation to pay policy benefits to Day To Day because Nautilus is entitled to deny coverage due to Day To Day's intentional misrepresentations of material fact and/or intentional concealment of material facts in the insurance application and/or in presenting the insurance claim to Nautilus.

59.     An actual controversy therefore exists between the parties that now requires a judicial declaration to determine the parties' respective rights and obligations with respect to Policy No. NN496718.

60.     Nautilus seeks a declaration that it owes Day To Day no policy benefits under Policy No. NN496718 and may deny coverage for defendant's claim due to Day To Day's violation of the Nautilus Policy's Concealment, Misrepresentation Or Fraud Condition by intentionally committing material misrepresentations and/or by intentionally concealing material facts in submitting the insurance application to Nautilus

61.     Nautilus seeks a declaration that it owes Day To Day no policy benefits under Policy No. NN496718 and may deny coverage for defendant's claim due to Day To Day's violation of the Nautilus Policy's Concealment, Misrepresentation Or Fraud Condition by intentionally committing material misrepresentations and/or by intentionally concealing material facts in presenting the insurance claim to Nautilus.

## **PRAYER FOR RELIEF**

1.     On the first cause of action for Declaratory Relief – Rescission:

a.     For a judicial declaration that Nautilus properly rescinded the Nautilus Policy based on material misrepresentations in the insurance application, such that the Nautilus Policy is null and void from the outset;

b.     For a judicial declaration that Nautilus properly rescinded the

Nautilus Insurance Company's Complaint For Declaratory Relief

735655.1 3891.39693

1    Nautilus Policy based on Day To Day's concealment of material facts in the insurance

2    application, such that the Nautilus Policy is null and void from the outset;

3           c.    For a judicial declaration that Nautilus owes no insurance policy

4    benefits under the Nautilus Policy in connection with defendant's claim.

5           2.    In the alternative, on the second cause of action for Declaratory Relief –

6    Misrepresentation:

7           a.    For a judicial declaration that Nautilus is entitled to deny

8    coverage for defendant's claim due to material intentional misrepresentations and/or

9    the intentional concealment of material facts in the insurance application in violation

10   of the Nautilus Policy's Concealment, Misrepresentation Or Fraud Condition;

11          b.    For a judicial declaration that Nautilus is entitled to deny

12   coverage for defendant's claim due to material intentional misrepresentations and/or

13   the intentional concealment of material facts in presenting the insurance claim to

14   Nautilus in violation of the Nautilus Policy's Concealment, Misrepresentation Or

15   Fraud Condition;

16          c.    For a judicial declaration that Nautilus owes no insurance policy

17   benefits under the Nautilus Policy in connection with defendant's claim.

18        3.    For costs of suit incurred herein; and

19        4.    For such other and further relief as the court may deem just and proper.

20

21                      **DEMAND FOR JURY TRIAL**

22        Plaintiff NAUTILUS INSURANCE COMPANY hereby demands trial by jury

23   in this action.

24

25

26

27

28

735655.1 3891.39693

1    DATED:  March 1, 2017                SELMAN BREITMAN LLP

2

3

4                                         By:   /s/ Timothy J. McFeely_____

5                                              MEKA MOORE
                                              TIMOTHY J. MCFEELY
6                                         Attorneys for Plaintiff Nautilus Insurance
                                          Company
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Nautilus Insurance Company's Complaint For Declaratory Relief

735655.1  3891.39693